**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**TACOMA DIVISION**

| | |
|---|---|
| MIKAELA MARIE STEVENS-HILLS and STEPHINE STEWART on their own behalf and all others similarly situated, <br><br>             Plaintiffs, <br><br>     v. <br><br> GLAMNETIC, LLC, <br><br>             Defendant. | Case No. 3:26-cv-05003-DGE <br><br> Honorable Judge David G. Estudillo <br><br> PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT |

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO
DISMISS COMPLAINT

i

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................................ 1

II.   APPLICABLE STANDARD............................................................................................ 2

III.  ARGUMENT .................................................................................................................. 2

    A.  Plaintiffs state claims under CEMA. ...................................................................... 2

        i.    The Complaint sufficiently pleads Glamnetic's scheme of spamming consumers, like Plaintiffs, with false time scarcity subject lines. ....................................................... 3

        ii.   Plaintiffs have pled that they received emails with subject headings that violate CEMA. ...................................................................................................... 3

        iii.  Plaintiffs sufficiently alleged Glamnetic's knowledge of email recipients' Washington residency. ...................................................................................... 6

    B.  Plaintiffs' CEMA claims are not barred by the Dormant Commerce Clause. ............... 8

    C.  Glamnetic's Arguments that CEMA is preempted fail. ................................................ 13

        i.    Glamnetic's Deceptions Are More Than Bare Immaterial Errors. ........................ 17

        ii.   CAN-SPAM'S preemption exception extends to CEMA's prohibition against "misleading" content in email subject lines. ............................................................... 20

        iii.  Glamnetic's non-existent preemption standard does not apply.............................. 22

    D.  Plaintiffs' CPA claim survives. ......................................................................... 25

    E.  Plaintiffs have pled injury under CEMA, and Glamnetic's attempt to dismiss actual and treble damages is premature............................................................................... 25

IV.   CONCLUSION............................................................................................................... 25

## **TABLE OF AUTHORITIES**

**Cases**                                                                          **Page(s)**

*Adams v. King Cnty.*,
164 Wash. 2d 640 (2008).............................................................................................23

*Am. Librs. Ass'n v. Pataki*,
969 F. Supp. 160 (S.D.N.Y. 1997) ...........................................................................11

*Asis Internet Servs. v. Consumerbargaingiveaways, LLC*,
622 F. Supp. 2d 935 (N.D. Cal. 2009).............................................................15, 22, 23

*Asis Internet Servs. v. Subscriberbase Inc.*,
No. 09-3503 SC, 2009 WL 4723338 (N.D. Cal. Dec. 4, 2009)..........................15, 22

*Asis Internet Servs. v. Subscriberbase Inc.*,
No. 09-3503 SC, 2010 WL 1267763 (N.D. Cal. Apr. 1, 2010)...............................15

*Asis Internet Servs. v. Vistaprint USA, Inc.*,
617 F. Supp. 2d 989 (N.D. Cal. 2009).................................................................15, 22

*Balsam v. Trancos, Inc.*,
138 Cal. Rptr. 3d 108 (Cal. Ct. App. 2012)............................................................15

*Benson v. Oregon Processing Service, Inc.*,
136 Wash. App. 587 (2007).....................................................................................20

*Booth v. Appstack, Inc.*,
No. C13-1533JLR, 2015 WL 1466247 (W.D. Wash. Mar. 30, 2015)....................11

*Brown v. Old Navy, LLC*,
4 Wash. 3d 580 (2025)..................................................................................... *passim*

*Brown-Forman Distillers Corp. v. New York State Liquor Authority*,
476 U.S. 573 (1986)...................................................................................................9

*Brummett v. Washington's Lottery*,
171 Wash. App. 664 (2012).....................................................................................25

*Cazarez-Guiterrez v. Ashcroft*,
382 F3d 905 (9th Cir. 2004) ...................................................................................21

*Daniel v. Lennar Corp.*,
No. 819CV00452JLSDFM, 2019 WL 8194735 (C.D. Cal. Oct. 16, 2019) ............25

*Eclectic Properties East, LLC v. Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014) .....................................................................................6

*Edgar v. MITE Corp.*,
    457 U.S. 624 (1982)................................................................................................11, 12, 13

*Elcon Const., Inc. v. E. Washington Univ.*,
    174 Wash. 2d 157 (2012).....................................................................................................24

*Fecht v. Price Co.*,
    70 F.3d 1078 (9th Cir. 1995) ..............................................................................................19

*Flynt v. Bonta*,
    131 F.4th 918 (9th Cir. 2025) ..................................................................................... *passim*

*Gordon. Hoang v. Reunion.com, Inc.*,
    No. C-08-3518 MMC, 2010 WL 1340535 (N.D. Cal. Mar. 31, 2010).............................15, 22

*Gordon v. Impulse Marketing Group, Inc.*,
    375 F.Supp.2d 1040 (E.D. Wash. 2025).........................................................................18, 19

*Gordon v. Virtumundo, Inc.*,
    575 F.3d 1040 (9th Cir. 2009) ..................................................................................... *passim*

*Harrington v. Vineyard Vines, LLC*,
    No. C25-1115 TSZ, — F. Supp. 3d —, 2025 WL 3677479  (W.D. Wash. Dec.
    18, 2025) ...............................................................................................................18, 19, 25

*Hartman v. United Bank Card, Inc.*,
    291 F.R.D. 591 (W.D. Wash. 2013) ....................................................................................11

*Healy v. Beer Institute*,
    491 U.S. 324 (1989)..................................................................................................9, 10, 12

*Ho v. Garland*,
    106 F.4th 47 (D.C. Cir. 2024).................................................................................................6

*Hughes v. Nw. Univ.*,
    63 F.4th 615 (7th Cir. 2023) ...................................................................................................6

*Hypertouch, Inc. v. ValueClick, Inc.*,
    123 Cal. Rptr. 3d 8 (Cal. Ct. App. 2011).........................................................................15, 22

*Isomedia, Inc. v. Spectrum Direct, Inc.*,
    No. C08-1733JLR, 2009 WL 10676391 (W.D. Wash. May 27, 2009)..................................24

*Kempf, et al.*, v. *FullBeauty Brands Ops.*,
    No. C25-1141 TSZ, 2026 WL 395677 (W.D. Wash. Feb. 12, 2026)................................7, 19

*Kousisis v. United States*,
    145 S. Ct. 1382 (2025)..............................................................................................18, 19, 24

PLAINTIFFS' OPPOSITION TO                              iv
DEFENDANT'S MOTION TO
DISMISS COMPLAINT

*Littlejohn v. Kaiser Fdn. Health Plan of Wash.*,
   2024 WL 4451955 (W.D. Wash. Oct. 9, 2024) ............................................................ *passim*

*Ma v. Nike, Inc.*,
   No. C25-1235JLR, — F. Supp. 3d —, 2026 WL 100731
   (W.D. Wash. Jan. 14, 2026)...............................................................................2, 18, 19

*Martin v. Miller*,
   24 Wash. App. 306 (1979).........................................................................................24

*MaryCLE, LLC v. First Choice Internet, Inc.*,
   890 A.2d 818 (Md. Ct. Spec. App. 2006) .................................................................12

*Nat'l Pork Producers Council v. Ross*,
   598 U.S. 356 (2023), (9th Cir. 2021)................................................................ *passim*

*New Mexico State Inv. Council v. Ernst & Young LLP*,
   641 F.3d 1089 (9th Cir. 2011) .....................................................................................8

*Omega World Travel, Inc. v. Mummagraphics, Inc.*,
   469 F.3d 348 (4th Cir. 2006) ....................................................................................16

*Rosolowski v. Guthy-Renker LLC*,
   230 Cal. App. 4th 1403 (2014) ..................................................................................15

*Sam Francis Foundation v. Christies, Inc.*,
   784 F.3d 1320 (9th Cir. 2015) (*en banc*) ....................................................10, 11, 12

*Sams v. Yahoo! Inc.*,
   713 F.3d 1175 (9th Cir. 2013) .....................................................................2, 10, 17, 20

*Shade v. Gorman*,
   No. C 08-3471 SI, 2009 WL 196400 (N.D. Cal. Jan. 28, 2009)...............................25

*Smith v. Anastasia Inc.*,
   2014 WL 12577598 (S.D. Cal. Sept. 15, 2014)...................................................15, 22

*State v. Heckel*,
   143 Wash. 2d 824 (2001) (*en banc*)................................................................. *passim*

*Hendrix ex rel. United States v. J-M Mfg. Co., Inc.*,
   76 F.4th 1164 (9th Cir. 2023) ...................................................................................24

*VoteVets Action Fund v. U.S. Dep't of Veterans Affs.*,
   992 F.3d 1097 (D.C. Cir. 2021) ...................................................................................6

*Wagner v. Spire Vision*,
   2014 WL 889483 (N.D. Cal. Mar. 3, 2014)........................................................15, 22

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO
DISMISS COMPLAINT

v

*Wright v. Lyft, Inc.*,
    406 P.3d 1149 (Wash. 2017)..........................................................................................23

**Statutes**

15 U.S.C. §§ 7701–7713 ............................................................................................ *passim*

Cal. Bus. & Prof. Code § 17529.5 ..........................................................................................15

Wash. Rev. Code. (RCW) § 19.190.020 ................................................................ *passim*

Wash. Rev. Code. (RCW) § 19.190.030 ................................................................ *passim*

**Rules**

Fed. R. Civ. P. 12...........................................................................................................2, 10

**Other Authorities**

Merriam-Webster Dictionary .................................................................................................20

S. Rep. No. 108-102.............................................................................................8, 11, 14

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO
DISMISS COMPLAINT

## I.    **INTRODUCTION**

Washington's Commercial Electronic Mail Act (CEMA) and Consumer Protection Act (CPA) prohibit commercial emails containing "false or misleading information in the subject line." RCW § 19.190.020(1)(b); *see id.* § 19.190.030(1)(b) (CEMA violations are CPA violations). Faced with this clear prohibition, affirmed in a recent decision from the Supreme Court of Washington, *see Brown v. Old Navy, LLC*, 4 Wash. 3d 580 (2025), Defendant Glamnetic, LLC ("Glamnetic") simply decided to ignore it.

Glamnetic relentlessly spams consumers' inboxes with email subject lines larded with caps and emoji that herald the beginning, middle, and merciful end of promotions—*falsely*. "FINAL HOURS: Cyber Monday" when the "hours" actually continued the next day. Dkt. 1-1 ("Compl."), ¶¶ 48-51. "LAST CALL: 40% Off" the day before Glamnetic sent another email, saying "Surprise! Shop 40% OFF Sitewide Until Tomorrow" *Id.* at ¶¶ 53-57. And so on. *Id.* at ¶¶ 30-99, Ex. A.

Feigned mistakes, false deadlines, urgent warnings. When deployed to deceive consumers, these tactics are known as false limited time messages, false time scarcity claims, or false urgency claims, *id.* ¶¶ 30-33, and are a "common way online marketers manipulate consumer choice by inducing false beliefs." *Id.* ¶ 30. Marketers use them because they *work*. *See id.* ¶¶ 30-39. They cause consumers to narrow their purchasing decisions, leaving them worse off. *See id.* As deployed by Glamnetic, these tactics are straightforward violations of CEMA and thus the CPA.

Glamnetic's Motion to Dismiss (Dkt. 10, "Mot.") seeks to distract this Court with irrelevancies and inapposite application of governing standards. Separating the wheat from the chaff: Glamnetic has no facial attack against Plaintiffs' well pled allegations of material deception under CEMA, aligned with the Washington Supreme Court's opinion in *Brown*; Glamnetic ignores

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO
DISMISS COMPLAINT

1

the governing standard for Dormant Commerce Clause application under *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 390 (2023), *aff'g* 6 F.4th 1021 (9th Cir. 2021); and Glamnetic's preemption argument misapplies the leading decision in *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040 (9th Cir. 2009)—as discussed in this Court's recent decision in *Ma v. Nike, Inc.*, No. C25-1235JLR, __ F. Supp. 3d __, 2026 WL 100731 (W.D. Wash. Jan. 14, 2026).

The Court should deny its motion.

## II.    APPLICABLE STANDARD

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the well-pled factual allegations are taken as true and all reasonable inferences are drawn in plaintiff's favor. *Littlejohn v. Kaiser Fdn. Health Plan of Wash.*, 2024 WL 4451955, at *3 (W.D. Wash. Oct. 9, 2024). The motion must be denied if the complaint states a claim that is "plausible on its face." *Id.* Where, as here, defendant seeks Rule 12(b)(6) dismissal based on an affirmative defense, it must show that the "allegations in the complaint suffice to establish the defense" and the defense is "apparent from the face" of the complaint. *Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir. 2013) (quotations omitted).

## III.   ARGUMENT

### A.  Plaintiffs state claims under CEMA.

Under CEMA, a company is liable for "initiat[ing] the transmission, conspire[ing] with another to initiate the transmission, or assist[ing] the transmission, of a commercial electronic mail message" to a Washington resident that "[c]ontains false or misleading information in the subject line." RCW § 19.190.020(1)(b). So, under CEMA, "spammers" like Glamnetic "must use an accurate, nonmisleading subject line," or otherwise face liability. *Brown*, 4 Wash. 3d at 588.

PLAINTIFFS' OPPOSITION TO                                2
DEFENDANT'S MOTION TO
DISMISS COMPLAINT

### i. The Complaint sufficiently pleads Glamnetic's scheme of spamming consumers, like Plaintiffs, with false time scarcity subject lines.

Glamnetic's cursory assertion—made in a lonely paragraph in its 24-page Motion—that Plaintiffs "cannot assert CEMA claims in connection with emails that they did not receive," misses the forest for the trees.  Mot., 4. Glamnetic's wants to cabin the Complaint to a handful of discrete emails. But Plaintiffs aren't challenging a handful of emails. The Complaint is clear that Glamnetic "is engaged in persistent marketing through mass email campaigns across the United States." Compl., ¶ 100. And as part of its mass email campaigns, it engages in a "*scheme* to compel consumers to purchase its products," through "send[ing] spam emails to consumers" with "urgent subject headings that do not reflect the true availability of the advertised deal," and further, that the specifically pled emails are just "*examples*" of that "scheme." *Id.* at ¶¶ 40, 42, 43, 44, 99. This is clear through extensive pleadings that Glamnetic engages in a "scheme," "strategy," or "technique" to misrepresent the availability of deals on its products. *Id.* at ¶¶ 40, 43, 44, 45, 46, 52, 53, 73, 91, 94, 98. Thus, Plaintiffs have pled a marketing scheme and pattern of emails that constitute CEMA violations, and their receipt of certain—but not all—emails in that scheme is more than sufficient. Discovery may reveal that Glamnetic sent even more deceptive emails to Plaintiffs and others.

### ii. Plaintiffs have pled that they received emails with subject headings that violate CEMA.

Having both received emails with subject lines that falsely and urgently convey a "Last Call" when there were more "calls" left on the deal, Plaintiffs have sufficiently pled their CEMA claims against Glamnetic.

In both emails received by Plaintiff Stevens-Hills, Glamnetic made an urgent "last call" on a discount that was subsequently replicated in a "new" deal with a new title. She received two

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO
DISMISS COMPLAINT

3

emails—also "described" "in Section B" of the Complaint (Compl., ¶ 111)—with the subject headings, "Last Call For Up To 35% OFF 🚨 " in July 2024 and "LAST CALL: 25-50% Off Sitewide 🚨 " in August 2024. *Id.* at ¶ 112. As to the July 2024 email: on "the very next day" Glamnetic offered a deal that both *encompassed and exceeded* the prior offering of "35% off" by offering to consumers "Up to 45% off." *Id.* at ¶¶ 79-81. Thus, the prior "last call" claim was false or misleading, where consumers could get 35% off, *and more*, the very next day.

Glamnetic myopically focuses on whether these deals were identical. Mot., 5. But CEMA deception is not as narrow as Glamnetic suggests. As the Supreme Court of Washington makes clear: CEMA focuses on "representations of fact—like the duration or availability of a promotion, *its terms and nature*, *the cost of goods*, *and other facts Washington residents would depend on in making their consumer decisions*." *Brown*, 4 Wash. 3d at 596 (emphasis added). Here, Glamnetic's "last call" invocation as to one deal, when immediately after that "last call" it offered a discount that incorporated the prior 35% deal (and *more)*, is a deceptive representation as to the duration for which key "terms" and "costs" (*i.e.* 35% off) would be available. *Id.* Indeed, it is a reasonable inference that the availability of a better deal just one day later would be "facts [that] Washington residents would depend on in making their consumer decisions." *Id.*

Likewise, in August 2024, Plaintiff Stevens-Hills first received a promotional email regarding a "Birthday Sale," urging in the heading: "LAST CALL: 25-50% Off Sitewide". Compl. ¶¶ 70-71; *id.* at ¶ 112 (received by Plaintiff Stevens-Hills). And the very next day, Glamnetic extended the 25% off "sitewide" discount, re-naming it the "Happy Hour Sale." *Id.* at ¶¶ 69-72. The next-day deal, offering 25% off "sitewide," was *encompassed by* the prior 25-50% off deal. So the "last call" for 25% off did not end with the Birthday Sale, and the fact that the deals were given "different" names is of no moment.

PLAINTIFFS' OPPOSITION TO                         4
DEFENDANT'S MOTION TO
DISMISS COMPLAINT

Glamnetic has no challenge to the emails received by Plaintiff Stewart, where she was told in the heading of an August 31, 2025 email that the Labor Day 40% off promotion "Ends Tomorrow!"—a message reiterated in the September 1, 2025 subject line, "LAST CALL: 40% Off'— when in fact, the Labor Day Sale continued through September 2. Compl., ¶¶ 53-58; *see id.* at ¶¶ 111, 113 (Stewart received emails "described" in "Section B"). Put simply, the deal did not end "tomorrow" (*i.e.* September 1), and September 1 was not the "last call." *Id.*

Glamnetic's argument that the Plaintiffs did not plead receiving emails that purported to *extend* the false deadlines is without merit. Mot., 5, 7. As *Brown* made clear, "the injury is receiving the e-mail that violates CEMA." 4 Wash. 3d at 592. The concept is simple: the conveyance of a falsehood is the harm, not the later conveyance of the truth that proves the lie.

Glamnetic's remaining CEMA challenges can be discarded. *First*, Plaintiffs do not challenge Glamnetic for the act of "offer[ing] a promotion, end[ing] it, and then offer[ing] a similar promotion weeks or month later." Mot., 5-6. Companies may *truthfully* offer deals with similar pricing for a similar product day after day after day. What they may *not* do is to send email subject lines—like those pled here—that mislead consumers about "*the duration or availability*" of a promotion." *Brown*, 4 Wash. 3d at 596 (emphasis added). *Second*, Glamnetic posits that these subject lines are "mere puffery." Mot., 5-6. Again, the court in *Brown* disagrees, contrary to Glamnetic's misleading implication otherwise. *Id.* at 6. False claims of deal scarcity are <u>not</u> "mere puffery," a benign designation "contrasted by representations of fact—*like the duration or availability of a promotion . . . and other facts Washington residents would depend on in making their consumer decisions*." 4 Wash. 3d at 596 (emphasis added). Here, the false or misleading "duration or availability," *id.*, invoked by false email headlines claiming "LAST CALL" for a discount is *material* to the decision-making process, described *infra*, Section III(C)(i). *See also*

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO
DISMISS COMPLAINT

5

Compl. ¶¶ 30-39 (*e.g.*, urgent calls to action are "psychologically effective").

Finally, Glamnetic's invitation to the Court to defy the governing standard and construe the well-pled facts *against* Plaintiffs should be rejected. *See Littlejohn*, 2024 WL 4451955, at *3. There is no basis in the Complaint for its "alternative explanation" of innocent promotion renewals based on "business conditions," aptly reflected in Glamnetic's failure to cite a single pleading in support of this argument. Mot., 6. By contrast, there are *extensive* pleadings that these falsely urgent deal "deadlines" were an intentional "scheme," "strategy," or "technique" designed to lure consumers to act quickly. Compl., ¶¶ 40, 43, 44, 45, 46, 52, 53, 73, 91, 94, 98.[1]

Glamnetic's only published Ninth Circuit decision is readily distinguishable. In *Eclectic Properties East, LLC v. Marcus & Millichap Co.*, plaintiffs' *own* allegations undermined their conclusion of intent to defraud. 751 F.3d 990, 998–99 (9th Cir. 2014); *see id.* at 996 ("Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *implausible*."). Here, Glamnetic's alternative explanation invites the Court to believe that sophisticated online retailers conceive and market significant promotions in less than a day's time, rendering prior representations of deal availability false. This alternative explanation has no basis in the Complaint. Nor is it plausible.

### iii. Plaintiffs sufficiently alleged Glamnetic's knowledge of email recipients' Washington residency.

Glamnetic's argument that Plaintiffs do not allege its knowledge of email recipients'

---

[1]At this stage, any "alternative explanation" offered by Defendant is neither appropriate nor warranted. *See, e.g.*, *Ho v. Garland*, 106 F.4th 47, 54 (D.C. Cir. 2024) ("A 'complaint survives a motion to dismiss' when 'there are two alternative explanations, one advanced by the defendant, and the other advanced by the plaintiff, both of which are plausible.'" (quoting *VoteVets Action Fund v. U.S. Dep't of Veterans Affs.*, 992 F.3d 1097, 1104 (D.C. Cir. 2021))); *Hughes v. Nw. Univ.*, 63 F.4th 615, 629 (7th Cir. 2023) ("Where alternative inferences are in equipoise—that is, where they are all reasonable based on the facts—the plaintiff is to prevail on a motion to dismiss.").

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO
DISMISS COMPLAINT

6

residence fails. Mot., 7-9. Glamnetic paints the pleadings as "speculation," ignoring that the Court must draw "all reasonable inferences in favor" of those pleadings. *Littlejohn*, 2024 WL 4451955, at *3. The Complaint includes extensive allegations that, as a "sophisticated commercial enterprise," Glamnetic knows of email recipients' Washington residency through, *e.g.*, tying email addresses to online purchases; tracking IP addresses of devices who open its emails[2]; the marketing platform ("Klaviyo") uses to manage its email campaigns; purchasing consumer data from brokers, who link emails to locations; and through "identity resolution" services, that connect emails to location. Compl., ¶¶ 100-109. *See also Kempf, et al.*, v. *FullBeauty Brands Ops.*, No. C25-1141 TSZ, 2026 WL 395677, at *3 (W.D. Wash. Feb. 12, 2026) ("FullBeauty cites no authority that would permit the Court to disregard the allegations of the operative pleading, to draw inferences against Kempf, or to consider contradictory facts or technological information outside the Amended Complaint."). Email marketing in 2026 is not a scattershot postal mailing that goes into the void—it applies sophisticated technology to reach a broad swath of consumers.

Glamnetic further takes issue with Plaintiff's allegation of its constructive knowledge, as provided under CEMA, where the "information is available, upon request, from the registrant of the internet domain name contained in the recipient's electronic mail address." RCW § 19.190.020(b)(2). CEMA provides for such constructive knowledge, *id.*; Plaintiff has pled Glamnetic's constructive knowledge, Compl., ¶¶ 108, 131; and all reasonable inferences from these pleadings must be drawn in Plaintiff's favor. *Littlejohn*, 2024 WL 4451955, at *3.

Glamnetic's charges of "speculation" about its own knowledge at this pre-discovery pleading stage are inapposite. As pled here, Glamnetic's knowledge and "the means it employs

---

[2] Glamnetic questions the reliability of IP addresses—*one* method pled by Plaintiff—to determine location. Mot., 8. But its cases do not constitute *evidence* that IP addresses do not reliably geolocate devices. This wholly evidentiary assertion is inappropriate at this pleading stage.

PLAINTIFFS' OPPOSITION TO                                     7
DEFENDANT'S MOTION TO
DISMISS COMPLAINT

are peculiarly within its knowledge."[3] Compl., ¶ 100.

These allegations are more than enough to allege that Glamnetic knew it was emailing Washington residents.

### B. Plaintiffs' CEMA claims are not barred by the Dormant Commerce Clause.

Constitutional challenges usually rest on what the Constitution says. Here, Glamnetic seeks invalidation of a duly enacted state statute on the basis of what the Constitution does *not* say. "[E]xtreme caution is warranted before a court deploys this implied authority." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 390 (2023), *aff'g* 6 F.4th 1021 (9th Cir. 2021). "Although it is not a clause in the Constitution," this doctrine is called the "dormant" Commerce Clause. *Flynt v. Bonta*, 131 F.4th 918, 923 (9th Cir. 2025). It is practically moribund. *See Pork Producers*, 6 F.4th at 1033 ("While the dormant Commerce Clause is not yet a dead letter, it is moving in that direction.").

In the CAN-SPAM Act, Congress considered the appropriate balance of state and federal power, specifically in light of "the inherently interstate nature of e-mail communications," S. Rep. No. 108-102, at 21, and enacted the Act's preemption provision to address it. Congress struck the balance by expressly declining to preempt state laws, like CEMA, that prohibit "falsity or deception," 15 U.S.C. § 7707(b), while saying nothing about any purportedly "extraterritorial impacts" such rules might have. *Cf. Pork Producers*, 598 U.S. at 390 ("[V]irtually all state laws create ripple effects beyond their borders.").

As to whether Congress' power to regulate interstate commerce prohibits Washington from

[3] Even under heightened fraud claims—*not applicable* here—one need only plead a "strong inference" of knowledge. *See, e.g.*, *New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011). This makes sense: at the pleading stage, a plaintiff has little-to-no way of accessing what the defendant *knows*.

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO
DISMISS COMPLAINT

8

protecting its residents against deceptive commercial spam, the answer is no. The Supreme Court's recent decision in *Pork Producers* "substantially clarified" the meaning and import of cases (like *Healy v. Beer Institute*, 491 U.S. 324 (1989) and *Brown-Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573 (1986), relied on by Glamnetic, Mot. 1, 9, 15, 16) invoking dormant Commerce Clause jurisprudence. *Flynt v. Bonta*, 131 F.4th 918, 924 (9th Cir. 2025). To begin with, the Court "unanimously disavow[ed]," the "virtual[] *per se* invalid[ity]" rule proffered by Glamnetic (Mot., 9-10, 14-16). *Pork Producers*, 598 U.S. at 389 n.4.

The Court clarified that the "antidiscrimination" principle at the "very core" of the Dormant Commerce Clause "principally 'prohibits the enforcement of state laws *driven by* [ ] economic protectionism—that is, regulatory measures *designed to benefit in-state economic interests by burdening out-of-state competitors*.'" *Flynt*, 131 F.4th at 924 (quoting *Pork Producers*, 598 U.S. at 369) (emphasis added). Thus, a statute is not unconstitutional without the "*specific* impermissible extraterritorial effect" of "prevent[ing] out-of-state firms from undertaking competitive pricing or depriv[ing] businesses and consumers in other States of whatever competitive advantages" they had. *Id.* (quoting *Pork Producers*, 598 U.S. at 374) (quotations omitted). These cases enforce the prohibition on "impermissible discriminatory purpose[s]," *not* "any broader, freestanding extraterritoriality principle." *Id.*

Take *Healy* itself. It involved a statute that "required out-of-state beer merchants to affirm that their in-state prices were no higher than those they charged in neighboring States." *Pork Producers*, 598 U.S. at 372. This protectionism was out in the open and uncontested: the statute did not "even try to cloak its discriminatory purpose" in applying only to "interstate firms." *Id.* at 373 (quotations omitted).

*Healy* and the other extraterritoriality cases are *nothing* like this one. The sole

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT

9

"extraterritorial impact" Glamnetic alleges here is the speculative and wholly irrelevant possibility that a Washington resident might happen to be out-of-state when she receives a false or misleading email from Glamnetic. *See* Mot. 14–19. There is nothing like the "*specific*" discriminatory effects condemned by *Healy* and cases like it, *Flynt*, 131 F.4th at 924, and indeed no discriminatory or protectionist effect of any kind.[4]

Nothing in *Sam Francis Foundation v. Christies, Inc.*, 784 F.3d 1320 (9th Cir. 2015) (*en banc*), relied on by Glamnetic, Mot. 15-18, requires a different result. To begin with, the holding of *Sam Francis* did not survive *Pork Producers*. *See Flynt*, 131 F.4th at 931 (noting question as open). As the dissent presciently observed, in *Healy* and the other extraterritoriality cases, "the laws at issue … had a direct effect on out-of-state commercial transactions by regulating the price or terms of such transactions, or by otherwise requiring an out-of-state merchant to seek regulatory approval in one State before undertaking a transaction in another." *Sam Francis*, 784 F.3d at 1331 (Reinhardt, J., dissenting in part) (citation omitted). In other words, "cases like *Healy* ... turned on an impermissible discriminatory purpose against out-of-state economic interests, not any freestanding extraterritoriality principle." *Flynt*, 131 F.4th at 929. The *Sam Francis* majority, by contrast, sought to enforce this "broader, freestanding extraterritoriality principle" that *Pork Producers* disfavors. *See Flynt*, 131 F.4th at 931 (citing *Pork Producers*, 598 U.S. at 373).

In sum, Glamnetic's assumption that any restrictions CEMA may impose on an out-of-state company—from, notably, using false or misleading messaging in its spam emails—violates the

---

[4] Glamnetic argues that Plaintiffs do not allege they were within Washington when they received any particular email. *See* Mot. 1, 3, 9. Even if that fact were constitutionally relevant (it is not), again, Glamnetic gets the pleading burdens backwards. Having elected to raise its CAN-SPAM defense under Rule 12(b)(6), it is *Glamnetic's* burden to show that it is "apparent from the face" of the Complaint that Glamnetic is entitled to dismissal. *Sams*, 713 F.3d at 1179.

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO
DISMISS COMPLAINT

10

Dormant Commerce Clause is undermined by its reliance on clarified, even overruled, precedent.[5] *Cf. Pork Producers*, 598 U.S. at 390 ("[V]irtually all state laws create ripple effects beyond their borders.").

But even a full-throated reading of *Sam Francis* cannot save Glamnetic, because it is readily distinguishable. First, Washington plainly has a legitimate interest in protecting its residents from conduct Washington deems harmful or undesirable. *See Edgar v. MITE Corp.*, 457 U.S. 624, 644 (1982) ("[P]rotecting local investors is plainly a legitimate state objective"); *State v. Heckel*, 143 Wash. 2d 824, 835 (2001) (*en banc*) (discussing harms from "[d]eceptive spam" to "individual Internet users" protected against by CEMA). No such interest was served by the California statute in *Sam Francis*, which protected artists' royalties from sales of art "whenever the seller resides in California or the sale takes place in California." 784 F.3d at 1323. CEMA requires a much closer connection to Washington.

Glamnetic's focus on consumers' location when they received the emails (Mot., 13-14) ignores the meaningful difference between the intangible spam email at issue here and the sales of tangible goods at issue in *Sam Francis*. Intangible commercial spam—particularly in light of "the inherently interstate nature of e-mail communications," S. Rep. No. 108-102, at 21—may have effects in several places at once, chief among them the home state of the recipient, no matter where

---

[5] None the cases cited by Glamnetic come after *Pork Producers*. Mot., 11. They all reflect this "freestanding extraterritoriality principle" that *Pork Producers* rejects. *Flynt*, 131 F.4th at 931. *See, e.g.*, *Hartman v. United Bank Card, Inc.*, 291 F.R.D. 591, 598 (W.D. Wash. 2013) (noting, "[a] prohibited extraterritorial law is one in which the practical effect of the regulation is to control conduct beyond the boundaries of the State"; *Booth v. Appstack, Inc.*, No. C13-1533JLR, 2015 WL 1466247, at *14 (W.D. Wash. Mar. 30, 2015) (A statute that "controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid *regardless of whether the statute's extraterritorial reach was intended by the legislature*" (emphasis added)); *Am. Librs. Ass'n v. Pataki*, 969 F. Supp. 160, 175 (S.D.N.Y. 1997) (same).

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT

11

she happens to be located. For example, the spam Glamnetic might send to a hypothetical, temporarily out-of-state Washington resident might arrive both on the phone she carries and on her desktop in Washington. Perhaps she reads Glamnetic's deceptive spam while out-of-state but hurries home to make a purchase before Glamnetic's sale "ends." The point is clear: Washington's interest in protecting its residents from commercial spam, irrespective of where those residents are at any given time, cannot be analogized to California's interest in regulating "a commercial transaction that 'takes place wholly outside of the State's borders.'" *Sam Francis*, 784 F.3d at 1323 (quoting *Healy*, 491 U.S. at 336).

Even within the terms of the "freestanding extraterritoriality principle" disavowed by *Pork Producers* (*Flynt*, 131 F.4th at 929) but enforced by *Sam Francis*, Glamnetic has simply failed to explain why it should matter where a Washington resident happens to be located at the particular moment when Glamnetic presses "Send" on a piece of deceptive spam addressed to her, as the Supreme Court of Washington made clear in *Heckel*: CEMA "does not burden interstate commerce by regulating when or where recipients may open the proscribed … messages." 143 Wash. 2d at 839 (rejecting extraterritoriality challenge); *see also MaryCLE, LLC v. First Choice Internet, Inc.*, 890 A.2d 818, 842 (Md. Ct. Spec. App. 2006) (cited by Defendant, Mot., 12) ("MCEMA does not regulate exclusively extraterritorial conduct because its focus is not on when or where recipients may open the proscribed ... messages." (quotations omitted)).

What matters is Washington's interest in protecting Washington residents. *See Edgar*, 457 U.S. 624 at 644; *Heckel*, 143 Wash. 2d at 839 ("[T]he Act addresses the conduct of spammers in targeting Washington consumers.").

Glamnetic attempts to render moot the contrary finding in *Heckel*, Mot., 12-13, by entirely ignoring the court's findings to misleadingly assert that the decision "tacitly" acknowledged its

PLAINTIFFS' OPPOSITION TO                                    12
DEFENDANT'S MOTION TO
DISMISS COMPLAINT

position that CEMA is unconstitutional. *Id.* Rather, the court's extensive findings and thorough analysis directly undermine Glamnetic's positions (*id.* at 14-16) regarding the local interests that CEMA serves and the purported extraterritorial burden it imposes.[6] Indeed, the court found: (1) CEMA is not facially discriminatory ("applies even-handedly to in-state and out-of-state spammers"); (2) CEMA serves a "legitimate local purpose," *e.g.*, against the well-documented "problems that spam causes"; and perhaps most notably, (3) "the only burden the Act places on spammers is the requirement of truthfulness, *a requirement that does not burden commerce at all but actually facilitates it by eliminating fraud and deception.*" *Heckel*, 143 Wash. 2d at 836 (citation omitted) (emphasis added). Finally, the court made the holding—a dispositive one, under the later, clarifying lens of *Pork Producers*—that CEMA does not "violate the extraterritoriality principle in the dormant Commerce Clause analysis," as "there is no 'sweeping extraterritorial effect' that would outweigh the local benefits of the Act." *Id.* at 839 (citing *Edgar*, 457 U.S. at 642).

Glamnetic's assertions that CEMA violates the Dormant Commerce Clause directly contravene governing decisions by the U.S. Supreme Court, the Ninth Circuit, and the Supreme Court of Washington. Its extraterritoriality arguments fail.

### C. Glamnetic's Arguments that CEMA is preempted fail.

Simply, CEMA is not preempted by the federal CAN-SPAM Act, 15 U.S.C. §§ 7701–7713 ("Act"). The Act's plain text, its legislative history, the Ninth Circuit's decision in *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040 (9th Cir. 2009), and cases decided before and after *Gordon* compel this conclusion. The Court need look no further than the plain text::

---

[6] Glamnetic feigns ignorance of the extent to which corporations like itself are able to divine all manner of information about consumers through today's sophisticated and readily available technology, asserting that "contacting an email registrar to ascertain the residency" of an email registrant is burdensome. Mot., 15. As amply pled here, there are *many* ways that companies like Glamnetic do, in fact, know this information. Comp., ¶¶ 100-109).

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO
DISMISS COMPLAINT

13

> This chapter supersedes any statute, regulation, or rule of a State or political subdivision of a State that expressly regulates the use of electronic mail to send commercial messages, *except to the extent that any such statute, regulation, or rule prohibits falsity* **or** *deception in any portion of a commercial electronic mail message or information attached thereto*.

15 U.S.C. § 7707(b)(1) (emphases added).

Application of this plain text to CEMA is straightforward. CEMA prohibits sending commercial email that "[c]ontains false or misleading information in the subject line." RCW § 19.190.020(1)(b). By prohibiting "false or misleading" subject lines in commercial emails, *id.*, CEMA "prohibits falsity or deception" in some part of or information attached to commercial emails. 15 U.S.C. § 7707(b)(1). By its plain terms, therefore, the Act does not preempt Plaintiffs' CEMA claims. Moreover, this "narrow" textual preemption analysis is "guided" by "a presumption against supplanting the historic police powers of the States" unless "that [is] the clear and manifest purpose of Congress." *Gordon*, 575 F.3d at 1060 (citations omitted). So, the idea is to construe the plain text and limit that construction to Congress' manifestly clear purpose.

The legislative history is clear. The Report of the Senate Committee on Commerce, Science, and Transportation described the effect of the Act as follows: "[A] State law requiring some or all commercial e-mail to carry specific types of labels, or to follow a certain format or contain specified content, would be preempted. By contrast, *a State law prohibiting fraudulent or deceptive headers, subject lines, or content in commercial e-mail would not be preempted*." S. Rep. No. 108-102, at 21 (emphasis added). The Report makes clear that Congress did not intend § 7707(b)(1) preemption to reach everything short of common law fraud, and indeed expressly endorses the very claims brought here: claims based on "a State law prohibiting … deceptive … subject lines … in commercial email" (*id.*)—directly contradicting Glamnetic's assertion that this

PLAINTIFFS' OPPOSITION TO                    14
DEFENDANT'S MOTION TO
DISMISS COMPLAINT

subject-line prohibition somehow renders CEMA a "strict liability statute."[7] Mot., 17, 20.

Court after court, before and after the Ninth Circuit's decision in *Gordon*, has concluded: statutory and common law claims that attack "falsity and deception" (§ 7707(b)(1)) broadly in commercial email are not preempted.[8] Attention to *Gordon*'s actual reasoning and holding, rather than loose citation to its dicta, reveals why. The question was "[w]hether the exception language of § 7707(b) permits states to prohibit e-mail activity that is *not* unfair or deceptive." 575 F.3d at 1062 n. 21. Unsurprisingly, the answer was no. *Gordon* involved CEMA's "point of origin" provision, which prohibits "misrepresent[ing] or obscur[ing] any information in identifying the point of origin or the transmission path" of commercial email. RCW § 19.190.020(1)(a); *see Gordon*, 575 F.3d at 1058. As construed by the court, CEMA's point-of-origin provision reaches "a vast array of nondeceptive acts and practices," including "unintentional clerical errors, imperfect representations, or immaterial misstatements." *Id.* at 1059 (quotations and citation omitted). The CAN-SPAM Act, by contrast, as interpreted in light of its text, structure, and purpose, *see id.* at 1061, does not authorize liability for "bare immaterial error," *id.* (quoting

---

[7] Glamnetic's support for its argument that CEMA's focus on subject lines renders it subject to preemption relies on cases that do not even mention CEMA. Mot., 17 (citing *Asis Internet Servs. v. Subscriberbase Inc.*, No. 09-3503 SC, 2010 WL 1267763 (N.D. Cal. Apr. 1, 2010) and *Rosolowski v. Guthy-Renker LLC*, 230 Cal. App. 4th 1403 (2014) (both construing Cal. Bus. & Prof. Code § 17529.5)).

[8] *See, e.g.*, *Asis Internet Servs. v. Subscriberbase Inc.*, No. 09-3503 SC, 2009 WL 4723338, at *3-*4 (N.D. Cal. Dec. 4, 2009); *Asis Internet Servs. v. Vistaprint USA, Inc.*, 617 F. Supp. 2d 989, 993 (N.D. Cal. 2009); *Asis Internet Servs. v. Consumerbargaingiveaways, LLC*, 622 F. Supp. 2d 935, 944 (N.D. Cal. 2009); *Smith v. Anastasia Inc.*, 2014 WL 12577598, at *2–3 (S.D. Cal. Sept. 15, 2014); *Wagner v. Spire Vision*, 2014 WL 889483, at *3–4 (N.D. Cal. Mar. 3, 2014); *Balsam v. Trancos, Inc.*, 138 Cal. Rptr. 3d 108, 122 (Cal. Ct. App. 2012); *Hypertouch, Inc. v. ValueClick, Inc.*, 123 Cal. Rptr. 3d 8, 27 (Cal. Ct. App. 2011), Indeed, one district court *reversed* its prior decision in light of *Gordon. Hoang v. Reunion.com, Inc.*, No. C-08-3518 MMC, 2010 WL 1340535, at *4 (N.D. Cal. Mar. 31, 2010) (vacating pre-*Gordon* decision) (plaintiff "not required" to "additionally allege he relied to his detriment" on false or misleading statement to avoid preemption.).

PLAINTIFFS' OPPOSITION TO                           15
DEFENDANT'S MOTION TO
DISMISS COMPLAINT

*Omega World Travel, Inc. v. Mummagraphics, Inc.*, 469 F.3d 348, 359 (4th Cir. 2006)), or "immaterial inaccuracies or omissions." *Id.* at 1062. Rather, the Act restricts state regulation to the field of "traditionally tortious or wrongful conduct." *Id.* (quoting *Omega*, 469 F.3d at 354).

Under this materiality standard, Gordon's claims were preempted. The Ninth Circuit found "nothing inherently deceptive" about "fanciful" domain names, *Gordon*, 575 F.3d at 1062, 1064, and rejected an inapposite argument that defendant's or a client's full name must "expressly appear" in "from" fields. *Id.* If CEMA imposed such a "labeling requirement," the court explained, it "clearly" fell outside the exception from preemption. *Id.* So *Gordon* focused on the materiality of the alleged deception, and on that question, the plaintiff's claims failed.

*Gordon* and the cases applying it thus explain the import of "traditionally tortious or wrongful conduct," 575 F.3d at 1062, in the preemption analysis, and give the lie to Glamnetic's characterization of Plaintiffs' CEMA claims as attempts to impose "strict liability." *See* Mot., 17, 19-20, 23. Beyond the unsupported assertion, *see supra* n. 7, that CEMA's focus on subject lines renders it a "strict liability" prohibition, Glamnetic's argument that email subject line content cannot be discretely deceptive ignores the Supreme Court of Washington's finding that the state legislature specifically "targeted" an "e-mail's header and subject lines," because they are "*the two pieces of information consumers first glean when faced with the choice of deleting a message or engaging with its content*." *Brown,* 4 Wash. 3d at 590–91 (emphasis added).

Under *Gordon*, to merit preemption, a defendant simply has to show it didn't do anything *wrong*, in light of the state standard to be applied to its conduct, viewed against the backdrop of what has traditionally been considered wrongful, as stated in *Heckel*:

> The only burden [CEMA] places on spammers is the requirement of truthfulness, a requirement that does not burden commerce at all but actually facilitates it by eliminating fraud and deception. Spammers must use an accurate, nonmisleading subject line. . . . While

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO
DISMISS COMPLAINT

16

spammers incur no costs in complying with the Act, they do incur costs for noncompliance, because they must take steps to introduce forged information into the header of their message.

143 Wash. 2d at 836-37.

### i.   Glamnetic's Deceptions Are More Than Bare Immaterial Errors.

The only question, therefore, is whether it is "apparent from the face" of Plaintiffs' Amended Complaint, *Sams*, 713 F.3d at 1179, that the misrepresentations they complain of are merely "bare immaterial error[s]." *Gordon*, 575 F.3d at 1061 (quotations omitted). It is not. Plaintiffs are not complaining of "fanciful" domain names or "from" fields that fail an invented "labeling requirement." *Id.* at 1063–64. To the contrary, Plaintiffs complain of Glamnetic's barrage of emails laden with false subject lines—*i.e.*, its false time-scarcity tactics—that are material to the behavior of ordinary consumers.

As alleged, "[f]alse time scarcity claims harm consumers by manipulatively distorting their decision-making to their detriment." Compl. ¶ 37. As one report cited in the Complaint concludes, "[f]alse or misleading scarcity claims can change the behaviour of consumers." Compl., ¶ 32 (citing U.K. Competition & Mkts. Auth., *Online Choice Architecture—How Digital Design Can Harm Competition and Consumers* 27 (2022)). Specifically, "[f]alse scarcity claims are psychologically effective because, as 'considerable evidence' suggests, 'consumers react to scarcity and divert their attention to information where they might miss opportunities.'" Compl. ¶ 34. One study found that "customers who took timed deals rather than waiting to see wider options ended up worse off than those who waited." *Id.* ¶ 38. *Littlejohn*, 2024 WL 4451955, at *3 (fact pleadings "accept[ed] as true" with "reasonable inferences [drawn] in favor" of Plaintiffs).

All of this accords with the well-worn federal law of materiality, not to mention common sense. "Whether in tort or contract law," materiality focuses on "the effect on the likely or actual

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT

17

behavior of the recipient of the alleged misrepresentation." *Kousisis v. United States*, 145 S. Ct. 1382, 1396 (2025) (applying wire fraud statute). A fact is material "if a reasonable person would attach importance to it in deciding how to proceed, or if the defendant knew (or should have known) that the recipient would likely deem it important." *Id.* (citation omitted). Representations about the timing and duration of sales, discounts, and other special offers are, at bottom, representations about prices. If a consumer is faced with the "LAST CALL: 40% Off" or "Last Call for Up To 35% Off" or "TODAY ONLY: 20% Off" the consumer must decide whether to take advantage of the deal by purchasing during the "last call" or "today", after which she loses the opportunity. Compl., ¶¶ 55, 79, 92; *see id.* at ¶¶ 30-109, Ex. A. And price is obviously a material fact—perhaps *the* material fact—affecting the behavior of consumers. *See* Compl. ¶¶ 32-34. If a consumer is in the market for a product or products she believes will cost more tomorrow, she will naturally "attach importance," *Kousisis*, 145 S. Ct. at 1396, to the fact that the price will be less if she buys it today.

Recent decisions in this District affirm the application of the state law CAN-SPAM exception to CEMA in this context. *Nike, Inc.*, 2026 WL 100731, at *2 (citing *Gordon*, 575 F.3d at 1062). Here, as in *Nike*, Plaintiffs allege a "pattern of Nike sending Washington residents commercial e-mails with subject lines containing allegedly false or misleading information regarding the duration or availability of sales promotions, falling directly under CEMA's subject-line provision which fits under the rights reserved to states within the CAN-SPAM Act's savings clause." *Id. See also Harrington v. Vineyard Vines, LLC*, No. C25-1115 TSZ, __ F. Supp. 3d __, 2025 WL 3677479, at *1[9] (W.D. Wash. Dec. 18, 2025), *reconsideration denied sub nom.* 2026

---

[9] Glamnetic misrepresents *Harrington*, stating that it relies on analysis from *Gordon v. Impulse Marketing Group, Inc.*, 375 F.Supp.2d 1040 (E.D. Wash. 2025). Mot., 18 n. 4. In fact, the

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO
DISMISS COMPLAINT

18

WL 125134 (W.D. Wash. Jan. 16, 2026) (CEMA not preempted by CAN-SPAM Act); *Kempf, et al.*, v. *FullBeauty Brands Ops.*, No. C25-1141 TSZ, 2026 WL 395677, at \*4-\*5 (W.D. Wash. Feb. 12, 2026) (same). *Nike*, *Harrington* and *FullBeauty* are recent, on point, and dispositive.

As for common sense, Glamnetic's argument flies in its face. Glamnetic is a "sophisticated commercial enterprise" that has "engaged in persistent marketing through mass email campaigns across the United States." Compl. ¶ 100. Its email marketing platform ("Klaviyo") enables it to, *inter alia*, track how many recipients engage with its marketing materials and to what extent. *See id.* ¶ 104. And email subject lines offer limited space within which Glamnetic can communicate "above the fold" messages that come to consumer attention even if the emails are immediately deleted or their contents ignored. Why, then, would Glamnetic choke its consumers' inboxes like coffee grounds in a clogged sink with email after email announcing "LAST CALL" or "TODAY ONLY" if those representations constitute mere immaterialities? The only plausible answer is, of course it would not. Glamnetic would not waste valuable marketing dollars on marketing messages unless they worked. And Glamnetic's false-urgency tactics work because they exploit well documented features of consumer psychology and behavior. *See id.* at ¶¶ 30-99. In other words, Glamnetic's tactics work because they misrepresent facts to which consumers "attach importance." *Kousisis*, 145 S. Ct. at 1396.

In any event, materiality is a complex mixed question of law and fact "typically … resolved by juries." *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995). Any doubts as to the materiality of Glamnetic's misrepresentations are to be doubly resolved against Glamnetic: once because it is not Plaintiffs' burden to plead materiality, but Glamnetic's burden to show Plaintiffs

---

Order cites the *Impulse Marketing Group* decision once, devoting most of its analysis to the 9th Circuit's governing decision in *Gordon*. *Id.*

PLAINTIFFS' OPPOSITION TO                    19
DEFENDANT'S MOTION TO
DISMISS COMPLAINT

have pleaded themselves out of court with immaterialities, *see Sams*, 713 F.3d at 1179; and twice because Plaintiffs should be afforded the benefit of fact and expert discovery to demonstrate the plausible inference that Glamnetic's misleading subject lines impact consumer behavior. And anyway, at this stage, the Court must draw reasonable inferences in Plaintiffs' favor. *See Littlejohn*, 2024 WL 4451955, at *3.

### ii.    CAN-SPAM'S preemption exception extends to CEMA's prohibition against "misleading" content in email subject lines.

In an argument that itself relies on misleading case construction, Glamnetic argues that CEMA's use of "misleading" places it outside the CAN-SPAM preemption exception for state laws that "prohibit falsity or *deception*" (§ 7707(b)(1)). Mot., 18-19. This assertion hardly passes the smell test, failing under ordinary comparison of the terms' definitions. *Compare* Merriam-Webster, "Deceptive" (listing "misleading" as a synonym)[10] *with id.* (listing "deceive" as a synonym for "mislead").[11] Moreover, in support of this assertion, Glamnetic misleadingly implies Ninth Circuit support, citing the court's inapposite summary of a state appellate decision regarding the terms "*misrepresent*" and "obscure," *not* the term "mislead." *Gordon,* 575 F.3d at 1059 (quoting *Benson v. Oregon Processing Service, Inc.*, 136 Wash. App. 587 (2007)).

Nor does Congress' interchangeable use of "misleading" and "deceptive" provide Glamnetic the support it seeks. Take 15 U.S.C. § 7704(a)(2), cited by Glamnetic, as an example: under the *heading* for "prohibition of *deceptive* subject headings," Congress defines such "subject headings" as including those that "would be likely to *mislead* a recipient." *Id.* Further, in the congressional findings supporting CAN-SPAM (cited by Glamnetic), Congress found that

---

[10] https://www.merriam-webster.com/dictionary/deceptive (accessed February 17, 2026).
[11] https://www.merriam-webster.com/dictionary/misleading (accessed February 17, 2026).

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO
DISMISS COMPLAINT

20

"unsolicited" commercial emails often contain "fraudulent or *deceptive*" messaging "in one or more respects," messaging that *includes* emails that with "*misleading* information" in the subject lines. *Id.* at § 7701(2), (8). Glamnetic absurdly points to the separate mention of these terms (Mot., 19), ignoring that they are referenced interchangeably, and myopically avoids statutory context. *See Cazarez-Guiterrez v. Ashcroft*, 382 F3d 905, 912 (9th Cir. 2004) ("[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme").

Moreover, this notion that "misleading" is materially distinct from "deceptive" is directly undermined by the *Brown* decision construing this very language. 4 Wash. 3d at 590 (construing RCW 19.190.020(1)(b)). Sitting *en banc*, the court looked to the interplay between Washington's CPA, which prohibits, *inter alia*, "unfair or deceptive acts or practices," and CEMA, which "targets a *specific deceptive commercial practice*: sending Washington residents commercial e-mails that contain 'false or *misleading* information in the subject line[s].'" *Id.* at 591; *see also id.* at 592 (explaining, the CEMA prohibited activity of "sending commercial e-mails with false *or misleading* subject lines," is "a particular type of *deceptive* commercial activity"). This construction of CEMA's use of "misleading" as a literal form of the "deceptive" conduct prohibited by the CPA ends the inquiry. *See Gordon,* 575 F.3d at 1059 (statutory interpretation demonstrating that CEMA "conform[s] with federal legislation," is a "task [that] is [ ] a matter for the State, as sovereign, to resolve").

Nor is Glamnetic's characterization of its subject line representations as "giving the wrong impression" apt. Consumers reading its "FINAL HOURS Cyber Monday" headline on November 27, 2023, for example, would reasonably believe that if there were "days"—and not just "hours," let alone hours urgently expressed in all caps as "FINAL"—Glamnetic would have said so. Compl., ¶ 49. But there was at least an additional day left; the "final hours" were not relegated to

PLAINTIFFS' OPPOSITION TO                    21
DEFENDANT'S MOTION TO
DISMISS COMPLAINT

November 27th. *Id.* at ¶ 50-52. These urgent headlines (*e.g.*, "last call," "today only," "final hours," "last chance") don't just give the wrong impression—they misstate the availability of the advertised sale and mislead consumers to purchase quickly before the deal comes to its (falsely represented) conclusion. *Id.* at ¶ 30-99.

This is no basis for preemption.

### iii. Glamnetic's non-existent preemption standard does not apply.

Second, Glamnetic constructs a made-up, torturous standard, purportedly under *Gordon*, to assert that Plaintiffs' CEMA claim must meet the elements of a CAN-SPAM Act claim. Mot., 20-23. Nowhere in *Gordon* does the court state that the Act's preemption exception requires an affirmative claim under the CAN-SPAM Act. *See generally Gordon*, 575 F.3d 1040. Rather, the court's analysis of the CAN-SPAM exception for state laws prohibiting "falsity or deception" in spam email found that those terms incorporate a materiality element, one that is plainly invoked under CEMA and Plaintiffs' claims here. *See supra* Section III(C)(i).

Nor does the court's reference to "traditionally tortious or wrongful conduct" invoke the elements of common law tort theories, like, *e.g.* fraud.[12] As described *supra* Section III(C)(i), *Gordon* and its progeny stand for the incorporation of materiality under common law tort theories to invoke preemption. They do not stand for an explicit adoption of the elements of a *different* law or standard other than that invoked by the exempted state law itself.[13] *Gordon*, at 575 F.3d at

---

[12] *See, e.g.*, *Asis Internet Servs.*, 2009 WL 4723338, at *3 (no "need to plead reliance and damages in order to avoid preemption"); *Asis Internet Servs*, 617 F. Supp. 2d at 993 ("declin[ing]" to "restrict . . . 'falsity or deception' to encompass only common-law fraud"); *Consumerbargaingiveaways*, 622 F. Supp. 2d at 944 (same); *Smith*, 2014 WL 12577598, at *2–3 (same); *Wagner*, 2014 WL 889483, at *3–4 ("showing of reliance and damages" is "not necessary"); *Hypertouch*, 123 Cal. Rptr. 3d at 27 (same); *Hoang*, 2010 WL 1340535, at *4 ("not required" to "allege he relied to his detriment" on false or misleading statement).

[13] For this reason, Glamnetic's citation to the court's invasion of privacy analysis in *Adams*

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO
DISMISS COMPLAINT

22

1063. Otherwise, as the court in *Consumerbargaingiveaways* reasoned:  use of the disjunctive references to "falsity *or* deception" in fact, "suggest[s] [a] broader application," not one "limited *just* to common-law fraud and other similar torts." 622 F. Supp. 2d at 942.

So Glamnetic is wrong that Plaintiffs are required to prove "actual knowledge" that its subject lines were false or deceptive. Mot., 21. Nonetheless, a demonstrably reasonable inference from pleadings that Glamnetic asserted "FINAL HOURS", "LAST CALL," "TODAY ONLY" and "LAST CHANCE" as to deals it continued days later is that Glamnetic *knew* the deal would be "extended." Compl., ¶¶ 30-99. Otherwise, how could it systematically implement the very deals it was advertising, and then advertise those deals to consumers across the U.S.? In any event, Plaintiffs' claims under CEMA or the CPA do not require intent. *See Wright v. Lyft, Inc.*, 406 P.3d 1149, 1153–55 (Wash. 2017) (elements of CPA and CEMA claims do not include intent).

Glamnetic is likewise wrong that Plaintiff was required to demonstrate "actual harm." Mot., 22-23 (citing the Ninth Circuit's analysis of the plaintiff's *separate, affirmative claim under the CAN-SPAM Act*, *Gordon*, 575 F.3d. at 1054). As the state's high court has emphasized: "CEMA does not require a showing of [actual] injury for statutory damages to be awarded *because the injury is receiving the e-mail that violates CEMA*." *Brown*, 4 Wash. 3d at 592 (emphasis added). Glamnetic takes a dim view of the statutory damages imposed by CEMA for its conduct, Mot., 7, but that does not make CEMA a strict liability statute.

And as discussed *supra* Section III(C)(i), Plaintiffs' CEMA allegations invoke false time-scarcity tactics plainly material to the behavior of ordinary consumers. Where Plaintiffs have alleged "considerable evidence" that false scarcity assertions trigger "consumers' react[ion] to scarcity" and the "diver[sion] [of] their attention to information where they might miss

*v. King Cnty.*, 164 Wash. 2d 640 (2008) has no bearing here. *Id.* at 662.

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO
DISMISS COMPLAINT

23

opportunities," Compl. ¶ 34, in the context of Glamnetic's representations that a particular deal is in the "FINAL HOURS" or that this is the "LAST CALL" to take advantage of the deal, Compl., ¶¶ 30-99, there is no question of materiality. *Kousisis*, 145 S. Ct. at 1396.

Further, Glamnetic ignores ample pleadings demonstrating that its false scarcity messages were material to them, including that Plaintiffs received emails with "LAST CALL" headlines, for discounts (i.e. 35% off (or better), 25% off and 40% off) that would be available again the very next day. Compl., ¶¶ 111-113; *see id.* at ¶¶ 53, 58, 69-72, 79-81. Plaintiffs are consumers; these messages invoke the very time scarcity they have pled as material to their decision-making behavior, *id.* at ¶¶ 30-39, and there is no requirement to plead reliance. *See supra* n. 13.

In any event, the question is not whether any particular Plaintiff changed their behavior in response to any particular email, but whether Glamnetic's misrepresentations would have an "effect on the *likely* … behavior" of its recipients. *Kousisis*, 145 S. Ct. at 1396 (emphasis added); *see also id.* ("[A] misrepresentation is material if a reasonable person *would attach* importance to it in deciding how to proceed[.]" (emphasis added)).

Glamnetic's inapposite *fraud* cases do not counsel otherwise,[14] and the court's decision on the CPA claim in *Brummett* largely turned on the plaintiff's failure to "target the creator of this alleged deception," who was not the defendant. *Brummett v. Washington's Lottery*, 171 Wash. App.

---

[14] Nearly all of its cases are about fraud. *See, e.g.*, *Elcon Const., Inc. v. E. Washington Univ.*, 174 Wash. 2d 157, 166-167 (2012) (under *fraudulent inducement* claim, court found the alleged misrepresentations "*not relevant*"); *Martin v. Miller*, 24 Wash. App. 306, 309 (1979) (on *fraud claim*, plaintiff must show that "representations were material to the plaintiffs' decision to enter into . . . agreement"); *Hendrix ex rel. United States v. J-M Mfg. Co., Inc.*, 76 F.4th 1164, 1169 (9th Cir. 2023) (quoting the "procedural history" portion of a decision regarding a False Claims Act challenge, where the jury was asked to assess, *inter alia*, "whether 'the false or fraudulent aspect of the claim' was 'material to [the plaintiff's] decision-making'"); *Isomedia, Inc. v. Spectrum Direct, Inc.*, No. C08-1733JLR, 2009 WL 10676391, at *4 (W.D. Wash. May 27, 2009) (on *fraud* claim, allegation not sufficient to meet *inapposite* reliance requirement).

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO
DISMISS COMPLAINT

24

664, 678 (2012). Moreover, the single-sentence finding that the phrase "going fast" was not materially deceptive, *id.*, is refuted by the later holding, in *Brown*, that "'representations of fact[s]– *like the duration or availability of a promotion. . .*' are subject to CEMA's subject-line standards." *Harrington*, 2025 WL 3677479, at *1 (quoting *Brown*, 4 Wash. 3d at 595–96). There is no CEMA preemption under the CAN-SPAM Act.

### D. Plaintiffs' CPA claim survives.

Glamnetic's only argument for dismissal of Plaintiffs' CPA claims is that they stand or fall with Plaintiffs' CEMA claims. *See* Mot., 23. As Plaintiffs' CEMA claims survive for the reasons given above, so too do their CPA claims.

### E. Plaintiffs have pled injury under CEMA, and Glamnetic's attempt to dismiss actual and treble damages is premature.

Finally, "[u]nder CEMA, the injury is receiving an e-mail that violates its regulations," *Brown*, 4 Wash. 3d at 584, an injury that has been amply pled. *See* Compl. ¶¶ 39-63, 74-77. Moreover, "[it] would be premature to strike or dismiss the request for treble damages prior to further development of the factual record on the issue." *Daniel v. Lennar Corp.*, No. 819CV00452JLSDFM, 2019 WL 8194735, at *5 (C.D. Cal. Oct. 16, 2019) ("[W]hen a plaintiff states a claim, the appropriate form of relief is not to be decided upon a motion to dismiss." (citations omitted)); *see also Shade v. Gorman*, No. C 08-3471 SI, 2009 WL 196400, at *2 (N.D. Cal. Jan. 28, 2009) (finding dismissal of actual damages claim and injunctive relief claims "premature"; noting, "[t]he complaint simply seeks actual damages to be proven at the time of trial. If plaintiff prevails on the [ ] claim, the Court will address the issue of damages at that time").

## IV.    **CONCLUSION**

The Court should deny Glamnetic's motion to dismiss.

*[Counsel signatures to follow on next page.]*

PLAINTIFFS' OPPOSITION TO                              25
DEFENDANT'S MOTION TO
DISMISS COMPLAINT

Date:    February 17, 2026                    Respectfully submitted:

                                              /s/ Samuel J. Strauss
                                              Samuel J. Strauss, WSBA No. #46971
                                              Raina C. Borrelli*
                                              **STRAUSS BORRELLI PLLC**
                                              980 N. Michigan Avenue, Suite 1610
                                              Chicago, IL 60611
                                              Telephone: (872) 263-1100
                                              Facsimile: (872) 263-1109
                                              sam@straussborrelli.com
                                              raina@straussborrelli.com

                                              *I certify that this memorandum contains 8,212 words in compliance with the Local Civil Rules.*

                                              Lynn A. Toops*
                                              Natalie A. Lyons*
                                              Ian R. Bensberg*
                                              **COHENMALAD, LLP**
                                              One Indiana Square, Suite 1400
                                              Indianapolis, IN 46204
                                              Tel.: (317) 636-6481
                                              ltoops@cohenmalad.com
                                              nlyons@cohenmalad.com
                                              ibensberg@cohenmalad.com

                                              Gerard J. Stranch, IV*
                                              Michael C. Tackeff (*pro hac vice*)
                                              Andrew K. Murray*
                                              **STRANCH, JENNINGS & GARVEY, PLLC**
                                              223 Rosa L. Parks Avenue, Suite 200
                                              Nashville, TN 37203
                                              Tel.: (615) 254-8801
                                              gstranch@stranchlaw.com
                                              mtackeff@stranchlaw.com
                                              amurray@stranchlaw.com

                                              *Attorneys for Plaintiffs*

                                              **\* Applications for admission**
                                              ***pro hac vice* forthcoming**

PLAINTIFFS' OPPOSITION TO            26
DEFENDANT'S MOTION TO
DISMISS COMPLAINT

**CERTIFICATE OF SERVICE**

I, Samuel J. Strauss, hereby certify that on February 17, 2026, I caused the foregoing to be electronically filed with the Court using the Court's CM/ECF system which will send an electronic copy to all parties and/or their counsel of record.

DATED this 17th day of February, 2026.

/s/ Samuel J. Strauss
Samuel J. Strauss, WSBA No. #46971
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
sam@straussborrelli.com

PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO
DISMISS COMPLAINT

27